IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5: 17-cv-279

| | |
|---|---|
| K-FLEX USA, L.L.C. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **COMPLAINT** |
| | ) |
| ARMACELL, LLC | ) **(JURY TRIAL DEMAND)** |
| | ) |
| Defendant. | ) |
| | ) |

K-Flex USA, L.L.C. ("K-Flex" or "Plaintiff") hereby files this Complaint against Defendant Armacell, LLC ('Armacell" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1. K-Flex brings this action because Armacell, the dominant manufacturer of elastomeric (rubber) insulation products in the United States, and the primary competitor of K-Flex in this market, is unlawfully attempting to exclude K-Flex from the market in an effort to maintain or enhance its dominant position, or to attempt to monopolize the market, by exploiting its recently acquired monopoly power in the market for polyethylene ("P.E.") insulation.

2. This action seeks to restrain Armacell's unlawful predatory and exclusionary practices that are damaging competition and harming consumers of elastomeric insulation, and to recover damages for Armacell's unlawful and anticompetitive conduct.

3. Armacell has consistently sought to eliminate competition in and monopolize

the markets in which it participates. Armacell had been in the P.E. market for a number of years, but finding limited success with its own products, has begun a campaign of acquiring other P.E. manufacturers to obtain a monopoly.

4. Armacell purchased the leading Canadian producer of P.E. insulation, Industrial Thermo Polymers (ITP), in 2015. This also gave Armacell a substantial additional market share of the U.S. market for P.E. insulation.

5. However, not content with less than a dominant position, Armacell announced in January 2017 that it had acquired Nomaco Insulation ("Nomaco"), the leading manufacturer of P.E. insulation products and formerly ITP's primary competition in the United States P.E. market.

6. After this acquisition, Armacell now controls approximately 90% of the market for P.E. insulation in the United States.

7. Having achieved a monopoly position in the P.E. market, Armacell now is attempting to consolidate and enhance its already dominant position and to obtain a complete monopoly in the elastomeric insulation market, by unlawfully excluding competition.

8. Specifically, Armacell has swiftly begun using its newly acquired monopoly power in the P.E. market to coerce distributors and other commercial partners and customers of K-Flex to stop or limit buying or distributing elastomeric insulation products from K-Flex. In doing so, Armacell endeavors to maintain or enhance its existing monopoly power in the elastomeric insulation market, or it threatens to monopolize the elastomeric insulation market in violation of federal antitrust law.

9. K-Flex has witnessed the results of this coercion first-hand. Shortly after

Armacell's announced acquisition of Nomaco, K-Flex's manufacturing representative and third-party logistics ("3PL") provider for elastomeric product for the Southeast region (which was also Nomaco's distributor for P.E. products), abruptly terminated a long term relationship with K-Flex, sending a terse attorney termination letter to K-Flex without any warning. The distributor has subsequently admitted it terminated its agreements with K-Flex under "pressure" from Armacell, and will no longer distribute or provide 3PL and warehousing services for elastomeric insulation products for K-Flex.

10. Armacell has also recently made overtures to K-Flex which appear to be attempts to collude and to restrain trade in the United States elastomeric and P.E. insulation markets.

11. Armacell's actions will damage the public, and harm competition, leading to increased prices for P.E. and elastomeric insulation products.

12. K-Flex seeks an injunction against Armacell prohibiting further anticompetitive activity in violation of antitrust law, including prohibiting the illegal use and maintenance of its monopoly power in the P.E. market to monopolize or attempt to monopolize the elastomeric insulation market, and to prohibit predatory and exclusionary practices including use of coercion to force distributors to terminate agreements and commercial relationships with K-Flex and to prevent distributors from dealing with K-Flex.

13. K-Flex also seeks damages, including treble damages, for the harm it has already suffered due to Armacell's illegal activity in violation of antitrust laws.

**PARTIES AND JURISDICTION**

14. Plaintiff K-Flex USA, L.L.C. is a limited liability company formed under the

3
Case 5:17-cv-00279-BO   Document 1   Filed 06/09/17   Page 3 of 20

laws of the State of North Carolina with its principal place of business located in Franklin County, North Carolina.

15. Defendant Armacell, LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business located in Orange County, North Carolina.

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1337 because this Complaint raises claims arising under the laws of the United States, including the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* and Clayton Antitrust Act, 15 U.S.C. § 12 *et seq.*, and venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### The Elastomeric (Rubber) Insulation Market

17. K-Flex and Armacell are competitors in the field of manufacturing elastomeric (rubber) insulation products.

18. The elastomeric insulation products manufactured by Armacell and K-Flex come in three basic forms: (a) rubber tubing that is used for insulation over piping, such as copper, iron, or vinyl pipes, or for any piping that needs to be insulated for temperature control purposes; (b) rubber insulation in roll form (in varying sizes and widths); and (c) sheets of rubber insulation for wrapping applications.

19. Elastomeric insulation products are used for many insulation applications, but are primarily used for HVAC/R (Heating Ventilation Air-Conditioning/Refrigeration), Commercial/Industrial/Marine applications, and plumbing applications.

20.     Armacell maintains a dominant market share in the United States market for elastomeric insulation manufacturing.  It is estimated upon information and belief that Armacell controls 70% or more of this market.  K-Flex is its primary competitor, with an approximate 20% market share of this market.  Other less significant market players, primarily Aeroflex USA, Inc., make up the remaining 10% of the United States market for elastomeric insulation manufacturing.

### The Polyethelene (P.E.) Insulation Market

21.     Polyethylene insulation ("P.E. insulation") is another type of insulation product.  It is generally a much cheaper product than elastomeric insulation, but it has a significantly lower melting point than elastomeric insulation, so it has a much narrower range of insulation uses.

22.     P.E. insulation is primarily used in plumbing applications where extreme cold and hot temperatures are less prevalent than in other applications, such as HVAC/R applications.  For example, P.E. insulation is often used to insulate residential hot and cold water lines, where the average water temperature of 120-130 degrees Fahrenheit is suitable for P.E. insulation.

23.     Prior to January 2017, Armacell participated in the United States market for P.E. insulation manufacturing, but the dominant player in this market was Nomaco.  In January 2017, however, Armacell announced that it bought Nomaco.  This acquisition gave Armacell control of well over 90% of the United States market for P.E. insulation manufacturing.

24.     Armacell's own public statements acknowledge the dominant position it has

now acquired in the United States P.E. insulation manufacturing market.

25. Armacell's January 9, 2017 press release announcing the Nomaco acquisition called it a "significant increase of [Armacell's] North American P.E. manufacturing footprint." (*Armacell acquires the Insulation Business of Nomaco – a leading US manufacturer of extruded polyethylene (PE) insulation foams*, Press Release, January 9, 2017, Attached as **Exhibit A**.)

26. Armacell's 2016 annual report describes the acquisition of Nomaco as "roughly doubl[ing]" its market share in P.E. products. (Armacell 2016 Annual Report, p. 49, excerpt attached as **Exhibit B**.)

27. Armacell's recent acquisition of monopoly power in the United States P.E. insulation manufacturing market now provides it with a strong tool to harm competition including in related markets such as elastomeric insulation where Armacell seeks to illegally leverage its monopoly power to increase its market share in the United States elastomeric insulation manufacturing market.

### The Relationship between the P.E. Insulation Market and Elastomeric Insulation Market

28. There is little interchangeability of P.E. insulation products and elastomeric insulation products.

29. P.E. insulation is used in applications where temperatures are low enough to make it a suitable product (and to save on cost). In applications requiring higher (or lower) temperatures, elastomeric insulation is the primary and preferred insulation product. Accordingly, the products are distinguishable in the eyes of the buyers and the products form

two separate product markets, though distributors offer both products.

30. Notably, the respective markets for both P.E. insulation products and elastomeric insulation products are more regional than global. Because both products are low-density, high-volume products, their transportation costs are high. Local service operations and rapid delivery capability (delivery within 24 hours of order) in a region is critical.

31. Accordingly, because it is not economical to manufacture either product overseas and ship it back to the United States, the United States generally has its own market for each product, with only a few U.S.-based manufacturers selling P.E. insulation products or elastomeric insulation products (or both) to downstream distributors. As a result, the relevant markets as described herein are the United States market for elastomeric insulation manufacturing (the "Elastomeric Insulation Market") and the United States market for P.E. insulation manufacturing (the "P.E. Insulation Market").

32. Given the low number of market participants, a single market participant can gain a monopoly position if it can acquire its competitors, or can successfully engage in other anticompetitive or exclusionary conduct to damage the few other competitors in the relevant market.

33. Although elastomeric insulation products and P.E. insulation products have different characteristics and are not interchangeable, they both are used in the same types of plumbing, HVAC/R, and commercial projects. As a result, the products also tend to use common distributors and distribution channels.

34. For many of these distributors which primarily serve plumbing markets, P.E. insulation products will represent a greater volume of sales than elastomeric insulation products.

**K-Flex**

35. K-Flex's parent company is L'Isolante K-Flex S.p.A., headquartered in Italy. In engages, through subsidiaries, in the manufacture of elastomeric insulation in markets around the world.

36. K-Flex's U.S. operations are based in Youngsville, in Franklin County, North Carolina.

**Armacell**

37. Armacell's parent company is based in Luxembourg. It engages in the manufacture of elastomeric insulation, P.E. insulation, and other foam products, around the world.

38. In 2013, Armacell's parent company was acquired by investment firm Charterhouse for $655 million. The Armacell parent was subsequently acquired by two private equity firms, Blackstone Group and Kirkbi, in the first quarter of 2016, for approximately $1 billion.

39. As a result of the private equity firms' purchase, the company is now highly leveraged by debt and therefore under strong pressure to increase its revenue and market share to service its significant debt obligations.

## Distribution Chains for the P.E. Insulation Market and the Elastomeric Insulation Market

40. Although P.E. and elastomeric products have different end uses, they are both distributed by distributors, many of which handle both P.E. insulation products and elastomeric insulation because end-customers purchase both types of products.

41. Prior to 2015, Armacell had about a one-third market share of the P.E. market.

42. In 2015, Armacell acquired Industrial Thermo Polymers (ITP) Canada, the leading Canadian manufacturer of PE products under the brand name "Tundra." This gave Armacell a dominant market position for P.E. manufacture in Canada. ITP also had significant sales into the United States (primarily along the eastern seaboard) and was thus a primary competitor to Nomaco.

43. In January 2017, when Armacell acquired Nomaco, it then obtained almost a complete monopoly in P.E. insulation manufacture – at least approximately a 90% market share of the P.E. Insulation Market.

## Sunbelt

44. K-Flex's exclusive distributor in the Southeast region of the United States for elastomeric insulation, prior to Armacell's acquisition of Nomaco, was Sunbelt Marketing, Inc. ("Sunbelt").

45. Sunbelt was K-Flex's manufacturing representative and also its third-party logistics ("3PL") provider for elastomeric product for the Southeast, providing a warehouse facility in Georgia for K-Flex products.

46. Sunbelt is the largest distributor of plumbing insulation products in the

9
Case 5:17-cv-00279-BO   Document 1   Filed 06/09/17   Page 9 of 20

Southeastern United States.

47. K-Flex has enjoyed a long term relationship with Sunbelt for over 15 years. K-Flex's elastomeric insulation sales through Sunbelt have been in excess $7 million per year.

48. Sunbelt has also been a direct purchaser of elastomeric products of approximately $1.2 million annually from K-Flex.

49. Prior to January 2017, Sunbelt was also the exclusive distributor of Nomaco's P.E. insulation products for the Southeast. With Armacell's acquisition of Nomaco, Sunbelt became a distributor for Armacell for P.E. insulation products.

**Sunbelt Terminates Its Distributor and Warehouse Agreements with K-Flex**

50. On March 30, 2017, without advance notice, K-Flex received a notice from Sunbelt's legal counsel that Sunbelt was terminating its distributor and warehouse agreements with K-Flex. The letter provided no basis for the termination. It did not cite, for example, that Sunbelt had found an alternate manufacturer for a lower price.

51. The sudden termination was also a surprise because K-Flex had met with Sunbelt at an industry conference in late January 2017, and it appeared from their meeting that their relationship was strong and healthy. Sunbelt did not express any dissatisfaction with their long-term relationship, pricing, or any other issues. However, Sunbelt did indicate at this January 2017 meeting that it was a bit nervous about having to work with Armacell (which had just acquired Nomaco) for P.E. insulation products, because Sunbelt had never worked with them before.

52. After receiving the termination letter from Sunbelt just two months later, K-Flex immediately attempted to reach out to its contacts at Sunbelt to find out why their long

relationship was being suddenly terminated without notice or explanation.

53. When K-Flex finally was able to speak with Sunbelt's owner, they were told that Sunbelt had to terminate its relationship with K-Flex due to "pressure" from Armacell, plainly a reference to the continued availability of P.E. insulation products. Sunbelt did not indicate that the termination had anything to with the price of K-Flex's elastomeric insulation products, or with K-Flex's products or performance.

54. As a distributor, Sunbelt needs to be able to offer both P.E. and elastomeric products to its customers. If Armacell, with its new monopoly in P.E. insulation, refuses to supply Sunbelt with P.E. insulation, it would significantly impair Sunbelt's continued viability as a distributor. Armacell can now apply the same "pressure" to any distributor of both P.E. and elastomeric insulation products.

55. After terminating its agreement with K-Flex, and as a result of Armacell's coercive pressure, Sunbelt began distributing Armacell's elastomeric insulation products (in addition to P.E. insulation products) and ceased all direct purchases of K-Flex's elastomeric insulation products. Sunbelt refuses to distribute K-Flex's elastomeric insulation products.

### **Application of Unlawful Practices to Distributors and Customers**

56. Armacell's ability to leverage its monopoly in the P.E. insulation market to force distributors to carry its elastomeric products (to the exclusion of competing products) allows Armacell to maintain or enhance its existing dominance of the elastomeric insulation market and/or creates a dangerous probability that Armacell will successfully monopolize the United States elastomeric market. Armacell already possesses approximately a 70% market share of the Elastomeric Insulation Market and it has grown its market share by restricting its

11
Case 5:17-cv-00279-BO   Document 1   Filed 06/09/17   Page 11 of 20

competitors' access to Sunbelt's distribution network.

57. K-Flex has already seen evidence of Armacell seeking to pressure other distributors to distribute Armacell elastomeric products and reduce and/or end their distribution arrangements with K-Flex.

58. Furthermore, upon information and belief, Armacell is seeking to pressure K-Flex customers for elastomeric products, who also were previously customers of Nomaco for P.E. insulation, to now purchase elastomeric insulation from Armacell instead of K-Flex, holding the potential withdrawal of the ability to continue to buy P.E. products as leverage. This includes Armacell refusing to honor customer's previously negotiated sales terms for purchases with Nomaco.

59. Upon information and belief, this pressure upon K-Flex customers for elastomeric products appears to be part of a systematic "sales strategy" by Armacell, intentionally derived from its "external growth strategy" as a method to increase market share, further their monopoly in the elastomeric market, and increase profit levels to the detriment of consumers and the market.

### Attempts to Seek Agreements to Restrain Trade

60. Since it was announced that Armacell was acquiring Nomaco, Armacell has made at least two overtures to K-Flex which appear to be attempts to collude in violation of federal antitrust law. K-Flex has categorically rejected these overtures.

61. In April 2017, an Armacell sales representative contacted K-Flex's national sales manager and asked whether K-Flex was increasing their prices.

62. K-Flex declined to discuss pricing with the Armacell representative, and only

confirmed the existence of a prior price increase of which the market (and therefore Armacell) was already aware.

63. In addition, at a recent industry conference, an Armacell sales representative met K-Flex's national sales manager. Learning his role at K-Flex, the Armacell representative immediately took him aside, and stated without further explanation, that "we just need to make sure we are all smart about this." K-Flex's representative understood this to be an invitation to discuss market collusion with Armacell, which would be illegal, and the conversation ended.

**Anticompetitive Conduct Abroad and at Home**

64. The parent companies of Armacell and K-Flex are competitors around the world in the elastomeric market. There is a past history of allegations and findings of anti-competitive behavior between the parties.

65. For example, in 2010, the Court of Milan found that Armacell was engaging in unfair competition in Italy, and enjoined Armacell from selling elastomeric insulation at below cost. Armacell and K-Flex's parent corporations later reached a confidential settlement of that litigation.

66. Armacell has also made recent acquisitions in other international markets, which demonstrates its intention to acquire and exploit monopoly power, just as it has done with the recent acquisition of Nomaco in the P.E. Insulation Market.

67. For example, as referenced above, in March 2015 Armacell announced that it was acquiring Industrial Thermo Polymers (ITP) Canada, the leading Canadian manufacturer of P.E. products under the brand name "Tundra." This gave Armacell a dominant market

13
Case 5:17-cv-00279-BO   Document 1   Filed 06/09/17   Page 13 of 20

position for P.E. manufacture in Canada (and increased its U.S. market share).

68. Armacell has also recently acquired a P.E. manufacturer in Brazil, thus increasing Armacell's market power in that market, consistent with its international strategy of seeking to monopolize markets through acquisitions.

69. Armacell has publicly described this strategy of acquiring its competitors as an "explicit external growth strategy" and "consolidating mergers and acquisitions strategy." (*See* Armacell 2016 Annual Report, pp. 20, 49, **Exhibit B**). Armacell's stated strategic plan is to "continue to pursue its mergers and acquisitions strategy in 2017 and beyond." *Id.*, p. 21.

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF 15 U.S.C. § 2**
**(MONOPOLIZATION OR ATTEMPTS**
**TO MONOPOLIZE ELASTOMERIC INSULATION MARKET)**

70. The allegations of Paragraphs 1 to 69 of the Complaint are re-alleged as if set forth herein.

71. Armacell has engaged in predatory and/or anticompetitive conduct by, among other things, tying its sales of P.E. insulation products to the sale of elastomeric insulation products or conditioning its distribution of P.E. insulation products on the parallel distribution of Armacell elastomeric insulation products or the refusal to distribute competing elastomeric insulation products.

72. Specifically, upon information and belief, Armacell is exploiting its monopoly power in the P.E. Insulation Market (an approximate 90% market share) and the threat of withholding its supply of P.E. insulation products or the threat of less favorable treatment in

or termination of existing commercial relationships regarding P.E. insulation products to force distributors, including Sunbelt, to purchase elastomeric insulation from Armacell to the exclusion of K-Flex and other manufacturers.

73. Elastomeric insulation and P.E. insulation are separate products, involve different insulation applications, and are sold in separate markets. Armacell's actions to tie the sale of P.E. insulation, where it has a monopoly position and therefore appreciable economic power, to the sale of elastomeric insulation, is forcing distributors and ultimately consumers to purchase Armacell products they would not otherwise purchase in a competitive market. Armacell's ability to coerce distributors into these exclusive-dealing arrangements or otherwise exclude competition for elastomeric insulation products is augmented by the fact that, particularly for distributors serving plumbing customers, if a distributor cannot obtain access to an adequate source of P.E. insulation, it cannot serve the needs of the plumbing insulation purchasers.

74. Armacell's scheme has already restricted K-Flex's access to elastomeric insulation customers in the Southeast by coercing Sunbelt to abandon its distributorship and warehousing agreements with K-Flex, and forcing Sunbelt to cease direct purchases of elastomeric insulation from K-Flex (which was approximately $1.2 million per year). This is foreclosing K-Flex and others from distributorship options and market access that represent a substantial share of the Elastomeric Insulation Market. This elimination of competition in the Elastomeric Insulation Market has damaged K-Flex and will damage consumers.

75. Armacell has engaged in this scheme with a specific intent to maintain or

enhance its dominant position and/or attempt to monopolize the Elastomeric Insulation Market.

76. Armacell has a dominant position and monopoly power in the Elastomeric Insulation Market, and/or there is a dangerous probability that Armacell will succeed in monopolizing the Elastomeric Insulation Market through the use of these predatory, exclusionary, and/or anticompetitive tactics. Before Armacell's acquisition of Nomaco's P.E. insulation business and Armacell's coercion of Sunbelt, it possessed approximately 70% market share of the Elastomeric Insulation Market. Its predatory and/or anticompetitive tying arrangements have only increased its market share.

77. In addition to awarding money damages, the Court should restrain and enjoin Armacell from engaging in the anticompetitive and predatory conduct described herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF 15 U.S.C. § 1**
**(AGREEMENTS TO RESTRAIN TRADE)**

78. The allegations of Paragraphs 1 to 77 of the Complaint are re-alleged as if set forth herein.

79. Upon information and belief, Armacell has entered into tying arrangements, exclusive dealing agreements, or agreements not to purchase or carry K-Flex elastomeric insulation products with distributors and market participants, including Sunbelt, that constitute agreements that unreasonably restrain trade and commerce. Because K-Flex is the only substantial competitor to Armacell in the elastomeric insulation market in the U.S., exclusion of K-Flex from distribution has the same competitive effect as tying arrangements or exclusive dealing agreements with distributors.

80. Specifically, upon information and belief, Armacell has entered into an agreement with Sunbelt to sell Sunbelt P.E. insulation products, but only on the condition that Sunbelt purchases and/or distributes elastomeric insulation products exclusively from Armacell and refuses to deal with K-Flex.

81. Armacell has coerced Sunbelt into entering this agreement in restraint of trade.

82. Armacell was able to coerce Sunbelt into entering this agreement because Armacell possesses appreciable economic power in the P.E. Insulation Market as illustrated by its approximate 90% market share.

83. Armacell's implicit or explicit agreements with distributors including Sunbelt affects a substantial volume of interstate commerce in the market for elastomeric insulation, damaging K-Flex, distributors, and consumers.

84. Armacell occupies a dominant market position in the P.E. Insulation Market, resulting in monopoly power in that market.

85. In the alternative, even if Armacell does not or did not have monopoly power in the P.E. Insulation Market, Armacell possesses sufficient market power to coerce distributors and purchasers including Sunbelt to enter implicit or explicit exclusive-dealing agreements that are agreements in restraint of trade in violation of 15 U.S.C. § 1.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 3 OF THE CLAYTON ACT

86. The allegations of Paragraphs 1 to 85 of the Complaint are re-alleged as if set forth herein.

87. Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits exclusive-dealing

arrangements where it is probable that performance of such arrangements will foreclose competition.

88. Armacell's implicit or explicit agreements with distributors and market participants including Sunbelt to not use or deal with K-Flex as a condition of gaining access to Armacell's P.E. insulation products is an unlawful tying arrangement and/or exclusionary practice, and its probable effect is to foreclose competition in a substantial share of the elastomeric insulation market in the United States in violation of Section 3 of the Clayton Act.

89. The exclusive-dealing agreement between Armacell and distributors including Sunbelt affects a substantial volume of interstate commerce.

90. K-Flex has been damaged by Armacell's conduct described above, and distributors and consumers of elastomeric insulation products will also be damaged through a reduction in competition.

**FOURTH CLAIM FOR RELIEF
VIOLATIONS OF N.C. GEN. STAT. § 75-1.1
(UNFAIR OR DECEPTIVE TRADE PRACTICES)**

91. The allegations of Paragraphs 1 to 90 of the Complaint are re-alleged as if set forth herein.

92. As alleged above, Armacell has engaged in unfair or deceptive acts in or affecting commerce, including in North Carolina, thereby causing actual damage to K-Flex in violation of N.C. Gen. Stat. § 75-1.1.

93. The harm caused by Armacell, which has its United States headquarters in North Carolina, has harmed K-Flex in North Carolina, which also has its United States headquarters in North Carolina.

94. As a direct and proximate result thereof, K-Flex has been damaged in an amount in excess of $25,000 and is entitled to recover treble damages, costs and attorneys' fees as allowed by law.

WHEREFORE, Plaintiff requests that the Court

1. Enter an injunction prohibiting Defendant's conduct which violates antitrust law;

2. Order remedial measures necessary to restore the status quo prior to Defendant's illegal conduct including if appropriate Armacell's divestiture of Nomaco assets to a new owner;

3. Enter judgment in Plaintiff's favor on its claim for violations of Section 2 of the Sherman Act (15 U.S.C. § 2);

4. Enter judgment in Plaintiff's favor on its claim for violations of Section 1 of the Sherman Act (15 U.S.C. § 1);

5. Enter judgment in Plaintiff's favor on its claim for violations of Section 3 of the Clayton Act (15 U.S.C. § 14);

6. Enter judgment in Plaintiff's favor on its claim for violations of N.C. Gen. Stat. § 75-1.1.

7. Conduct a trial by jury on all issues so triable;

8. Award actual damages sustained by Plaintiff in an amount to be proved at trial;

9. Award treble damages as required by statute under federal and North Carolina law, for the harm caused by Defendant;

10. Award costs and attorneys' fees to Plaintiff to the extent permitted by law; and

11. Award other appropriate relief as determined by the Court.

This the 9th day of June, 2017.

    SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

    By: /s/ J. Mitchell Armbruster
        J. Mitchell Armbruster
        NCSB No. 26422
        marmbruster@smithlaw.com
        John E. Harris
        NCSB No. 49253
        Post Office Box 2611
        Raleigh, North Carolina 27602-2611
        Telephone: (919) 821-1220
        Facsimile: (919) 821-6800
        *ATTORNEYS FOR PLAINTIFF*